# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs October 2, 2012

## STATE OF TENNESSEE v. EDDIE HOOF

**Appeal from the Criminal Court for Shelby County**
**No. 09-06412      Lee V. Coffee, Judge**

---

**No. W2011-02164-CCA-R3-CD  - Filed February 5, 2013**

---

A Shelby County grand jury indicted appellant, Eddie Hoof, for first degree premeditated murder, first degree felony murder, attempted first degree murder, and especially aggravated burglary.  A jury found him guilty of two counts of second degree murder, one count of attempted first degree murder, and one count of especially aggravated burglary.  The trial court merged the two convictions of second degree murder and sentenced appellant to an effective sentence of fifty-seven years in the Tennessee Department of Correction.  On appeal, he challenges the sufficiency of the convicting evidence and the trial court's imposition of consecutive sentences.  Following our review, we affirm the judgments of the trial court.  However, we remand the case to the trial court for correction of the judgment form for especially aggravated burglary to reflect a consecutive sentence.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROGER A. PAGE, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and JEFFREY S. BIVINS, JJ., joined.

Juni S. Ganguli, Memphis, Tennessee (on appeal); and Arthur E. Horne and Murray B. Wells, Memphis, Tennessee (at trial), for the appellant, Eddie Hoof.

Robert E. Cooper, Jr., Attorney General and Reporter; Cameron L. Hyder, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Jeff Jones and Carla L. Taylor, Assistant District Attorneys General, for the appellee, State of Tennessee.

# OPINION

## I. Facts

In the early morning hours of March 30, 2009, appellant forcibly entered the apartment of the victim[1], Angela Greer, where he fatally shot her and wounded a second individual, Lonnie Bell.

### A. Trial

Appellant's trial began on April 12, 2011. The State called Prescilla Brown as its first witness. Ms. Brown was the victim's mother. Ms. Brown testified that the victim and appellant had been involved in a relationship for approximately three years and had a child together. When they first began seeing each other, Ms. Brown thought that their relationship was good. She testified that the relationship later "turned bad."

At the time of her death, the victim lived in Peppertree Apartments, apartment ten. Ms. Brown possessed a set of keys to the apartment. She did not believe that appellant ever spent the night there. She visited the victim often and never saw appellant at the apartment. Approximately two weeks prior to the victim's death, Ms. Brown installed two deadbolt locks on the apartment door for the victim's safety. At the time of her death, the victim worked as a female dancer at a club called "New York New York."

On cross-examination, Ms. Brown testified that the victim's child was two months old at the time of the victim's death. She confirmed that she visited the victim at her apartment each day and that if appellant lived there, she would have known about it. Ms. Brown also noted that the entry gate to Peppertree Apartments was broken, so she would park in the parking lot and enter the property through a hole in the fence.

The State's next witness, Lonnie Bell, testified that he first met the victim at the club where she was employed. He also met appellant there. He had known the victim, whom he knew by her stage name "Dynasty," for approximately one year at the time she died. He also knew of appellant, whose nickname was "Boochie." Mr. Bell saw the victim at the club on the day before she was killed. They "hooked up" at a gas station at some point in the early morning hours of March 30, 2009. The victim arrived in a separate vehicle, then entered Mr. Bell's vehicle. They drove to the victim's apartment around 3:00 or 4:00 a.m. Mr. Bell

---

[1] Angela Greer was the victim of the indicted offenses of first degree premeditated murder and first degree felony murder. Lonnie Bell was the victim of the attempted first degree murder offense. In this opinion, we refer to Ms. Greer as "the victim" and to Mr. Bell by name.

testified that upon arrival, he did not notice any damage to the apartment door, and no one else was present at the apartment.

Mr. Bell and the victim later went to sleep in the victim's bedroom. They were awakened by loud beating on the door. Mr. Bell stated that it was a continuous sound that lasted for several minutes. He asked the victim who was at the door, and she told him, "You already know who it is." The knocking then stopped. Approximately ten minutes later, the sound resumed. Someone was also kicking the door, which caused the door to give way. Appellant entered the apartment and ran up the stairs to the victim's bedroom. Mr. Bell testified that appellant did not speak as he ran up the stairs, but he heard appellant cock a gun. Both the victim and Mr. Bell were clothed at that point. Appellant stopped at the doorway and demanded that Mr. Bell get off the bed. The victim was already in a standing position. Mr. Bell saw appellant's gun and recalled that it was chrome and black. Neither Mr. Bell nor the victim was armed. Mr. Bell stood up. The victim said something to appellant, and appellant shot her in the abdominal area. Appellant then shot Mr. Bell.

Mr. Bell testified that the victim had already called 9-1-1 at the time appellant entered her home. After he was shot, Mr. Bell ran to a nearby apartment and knocked on the door. A man opened the door and called 9-1-1, and police and an ambulance responded to that location. The ambulance transported Mr. Bell to the hospital where he underwent surgery for the gunshot wound to his stomach. A police officer visited him at the hospital and asked him to identify the person who shot him from a photograph. Mr. Bell identified appellant from an array of photographs.

On cross-examination, Mr. Bell denied that he and appellant "hung out" prior to the victim's death. He further denied meeting appellant at the club on the weekend prior to the shooting and leaving with appellant. Mr. Bell testified that "his girl" also worked at the same club where the victim had worked. He admitted that he had previously seen appellant at the home of "Rico's" mother a few times but that he and appellant had never "hung out" at the club or at Rico's house. Mr. Bell stated that on one occasion, he asked appellant why he was telling people that Mr. Bell was involved with the victim. Appellant responded that he was no longer involved with the victim and did not care what she did. The weekend following that conversation, Mr. Bell and the victim had sexual intercourse, and appellant shot them.

Kristopher Massey testified that he was visiting his girlfriend and her friend at the Peppertree Apartments, apartment four, on March 30, 2009. He was awakened early in the morning by the sound of someone beating on the door and window. He opened the door for the man, whom Mr. Massey later learned was Mr. Bell. Mr. Bell informed Mr. Massey that he had been shot. Mr. Bell entered the apartment and fell to the floor. Mr. Massey called

out to his girlfriend and her friend and told them to call 9-1-1. Before emergency personnel arrived, Mr. Massey walked outside and witnessed a man dropping a gun as he ran. He could see that the gun was silver and brown. The man, whom he later learned was appellant, picked the gun up and continued to run. He identified appellant in court as the man he saw drop the gun. After an ambulance transported Mr. Bell to the hospital, Mr. Massey gave a statement to police officers. He also identified appellant from an array of photographs.

Officer Darrin Seitz with the Memphis Police Department testified that he and Officer Lyon responded to a call involving a shooting at Peppertree Apartments on March 30, 2009. They responded to apartment four, where they observed Mr. Bell. They attempted to keep Mr. Bell calm and apply pressure to his gunshot wound until paramedics arrived. Officer Seitz said that Mr. Bell told him "a guy named Boochie" had shot him. Officer Seitz stated that at that point in the investigation, they did not have a suspect in custody. He radioed for another officer to respond to the scene and to remain with Mr. Bell until the paramedics arrived, then he proceeded to the victim's apartment.

On cross-examination, Officer Seitz explained that Peppertree Apartments was, to some extent, a high crime area. Aside from ascertaining the identity of the shooter, he was unable to gather additional facts about the shootings from Mr. Bell or anyone else.

Martoyia Lang, an officer with the Memphis Police Department, testified that she responded to Peppertree Apartments, apartment ten, on March 30, 2009. She was the first officer on the scene. When she arrived, she first noted that the front door of the apartment had been kicked in, and part of the door frame was lying on the floor. She noted blood on the door jamb and on the door knob. The interior door knob still had keys inside the lock, and the deadbolt lock was intact in the locked position. Upon entering the apartment, Officer Lang observed the victim's body lying in the stairwell. She observed what appeared to be gunshot wounds to the victim's leg, head, hand, and arm. Officer Lang continued up the stairs to clear the scene, where she located a spent shell casing on a mattress in an upstairs bedroom. When she confirmed that the scene was secure, she went back downstairs.

On cross-examination, Officer Lang confirmed that Peppertree Apartments was a high crime area. She stated that she personally responded to approximately twenty calls to Peppertree Apartments on a weekly basis. She testified that she did not touch the victim's body or photograph the scene.

Nathan Few, a firefighter/paramedic with the City of Memphis Fire Department, testified that he responded to Peppertree Apartments on the morning of March 30, 2009. Upon entering apartment ten, he noted signs of forcible entry on the doorway. He then located the victim, who had been shot in the head. After he performed a "rapid trauma

assessment" on the victim and determined that she was "nonviable," he left apartment ten and proceeded to apartment four, where Mr. Bell was located. When Mr. Few arrived, Mr. Massey was applying pressure to Mr. Bell's wound. After stabilizing Mr. Bell, paramedics placed him in the ambulance and drove him to the hospital. Mr. Few classified Mr. Bell's condition as "critical."

Terry Lee, a firefighter/paramedic with the Memphis Fire Department, testified that he was in the second unit dispatched to Peppertree Apartments to respond to a scene with multiple shootings. He responded to apartment ten. When he located the victim, he attached electrodes to verify the electrical activity of the victim's heart and found none. The victim was not breathing, and he could not locate a pulse. Mr. Lee noted wounds to the victim's right hand and to the cheek/temple area, where brain matter was emerging. He pronounced the victim's time of death as 0930 (9:30 a.m.). He also observed that the door appeared to have been kicked in, and the door frame was damaged. After pronouncing the victim's time of death, he turned the crime scene over to law enforcement officers.

Lavern Jones, a sergeant with the traffic division of the Memphis Police Department, testified that at the time of the investigation in this case, he was a crime scene officer with the department. As part of his responsibilities, he created a sketch of the crime scene. His sketch was admitted as an exhibit at trial. He also recovered four spent .380 caliber shell casings and a bullet fragment.

On cross-examination, Sergeant Jones testified that he did not retrieve a weapon in this case. He also did not obtain any fingerprints from the scene. Sergeant Jones further recalled reading a report that said the victim had the word "Hoof" tattooed on her shoulder. During his evaluation of the crime scene, he did not ascertain the name of the owner of the apartment, did not examine any of the clothing articles within the apartment to determine whether they were men's or women's clothing, and did not know to whom the furnishings belonged.

Sergeant Jason Webb with the Memphis Police Department was assigned to the TACT[2] Unit in March 2009. He became involved in the investigation at Peppertree Apartments at the behest of Sergeant Tony Mullins. Sergeant Mullins had received information that appellant was located in an apartment complex on Clementine, and based upon that information, Sergeant Webb apprehended appellant at that location.

---

[2] This unit is specially trained to respond to various emergency situations, such as barricade situations, hostage rescues, counter-terrorism, and high-risk felony apprehensions.

Sergeant Anthony "Tony" Mullins was an investigator with the Memphis Police Department in March 2009. He was first asked to respond to appellant's place of employment, a dental clinic, in an attempt to locate him. Sergeant Mullins called the TACT team, who responded to the dental clinic. Appellant was not apprehended at the first location. Sergeant Mullins reviewed the clinic's surveillance footage with the manager of the office and determined that appellant arrived at the location at 8:37 a.m., obtained the keys to a clinic van, and left the area two minutes later. Sergeant Mullins sent various members of the TACT team to different addresses to attempt to locate appellant.

Sergeant Mullins returned to the police department office, where he received a telephone call patched through from Crime Stoppers. The caller indicated that he was aware that a homicide had occurred, that appellant might have been involved, and that appellant had telephoned the caller and asked if appellant could come to the caller's apartment located in the Warren Apartments on Clementine, also known as the Clementine Apartments. Sergeant Mullins arranged for Sergeant Webb to proceed to the Warren Apartments and wait for appellant to arrive. When appellant arrived, officers arrested him and two other individuals who were in the vehicle.

After appellant had been transported to the police department, Sergeant Mullins reviewed the advice of rights form with him. Appellant signed the form, and the officers interviewed him. After Sergeant Mullins confronted appellant with the 9-1-1 tape and the information already gathered by law enforcement, appellant explained that he arrived at work on the morning of March 30, 2009, obtained the keys to the clinic van, and drove to the victim's apartment. He recognized Mr. Bell's car parked outside and could hear Mr. Bell's voice inside the apartment. Appellant said that he heard the bed moving, so he kicked in the door, went upstairs, and confronted Mr. Bell. Mr. Bell was lying on top of the bed, fully clothed, and the victim was sitting on the bed, also clothed. He claimed that Mr. Bell "smarted off" to him and charged toward him as if to grab the gun from him. Appellant admitted that he shot Mr. Bell at that point. He then confronted the victim, who allegedly tried to take the gun from him, at which time he shot her two or three times. The last time he saw the victim, she was coming down the stairs and had gotten to the landing between the two sets of stairs. Appellant stated that after Mr. Bell fled the apartment, appellant also left the victim's apartment. He tucked the gun in his waistband, but as he was running, it fell through his pants leg and onto the ground. He picked it up and went to his mother's house, where he threw the gun out the window. He exchanged vehicles and was then dropped off at a friend's house. Sergeant Mullins classified appellant's statement at that point as "vague" but testified that the statement ended with appellant's arriving at the Warren Apartments and being arrested. Appellant also acknowledged that he used a .380 caliber weapon when he shot the victim and Mr. Bell. Sergeant Mullins testified that officers did not recover the weapon.

During the statement, appellant admitted that he did not live in Peppertree Apartments with the victim but that he would stay there occasionally. At some point, appellant stated that he wished to wait on an attorney before answering further questions. Officers halted the interview at that time.

On cross-examination, Sergeant Mullins acknowledged that appellant said in his statement that he and Mr. Bell were friends and would "hang out" together on occasion. Appellant also told Sergeant Mullins that although he did not live at the victim's apartment, he would spend the night there and kept clothing there. On re-direct examination, Sergeant Mullins confirmed that when he asked for appellant's address, appellant gave his mother's address as his own.

Dr. Lisa Funte testified on behalf of Dr. Marco Ross, who performed the autopsy of the victim in this case. Both doctors are medical examiners employed by the Shelby County Regional Forensic Medical Center. The court qualified Dr. Funte as an expert in the field of pathology and allowed her to testify about Dr. Ross's findings. The autopsy revealed gunshot wounds to the victim's abdomen, right hand, right cheek, and head. Dr. Funte testified that the gunshot wounds to the abdomen and head would have been fatal. She noted that two of the wounds were "penetrating," i.e., they did not have exit wounds, and that Dr. Ross recovered bullet fragments from those wounds during the autopsy. Dr. Ross determined the cause of death to be multiple gunshot wounds and the manner of death to be homicide, and Dr. Funte agreed with his conclusions. On cross-examination, Dr. Funte testified that the toxicology report indicated the presence of alprazolam and cannaboids, or marijuana, in the victim's blood.

As its first witness, the defense presented Latanya Curry, who lived in apartment six at Peppertree Apartments. She testified that she met appellant when he and his girlfriend, whom she called "Angel," moved in to Peppertree Apartments. Ms. Curry saw appellant at the apartment frequently and said that he possessed keys to the apartment. She stated that she was sure of this fact because the victim locked herself out of the apartment one day and borrowed Ms. Curry's telephone to contact appellant, who arrived and opened the door for the victim. Ms. Curry testified that the victim "put[ ] a knife in her door" as a safety precaution to secure her home. She recalled that she had met the victim's mother but that she did not see the mother very often.

On cross-examination, the State elicited from Ms. Curry that on the day when the victim was locked out of her apartment, the victim stated, "Boozie [sic] got the key[,] and he done [sic] locked me out." Accordingly, she did not know whether appellant had his own set of keys or had taken the victim's keys that day. She also did not know whether the victim had a deadbolt installed on her front door or whether appellant had a key to the deadbolt. On

redirect examination, Ms. Curry stated that she saw the victim and appellant together at the grocery store the day the victim was murdered and that appellant had recently been at the victim's apartment.

Shantah Richardson testified that appellant's younger sister was his cousin. Because of that relationship, he considered appellant family. He had known appellant for approximately ten years. At some point about four to five years prior to the victim's murder, Mr. Richardson resided with his aunt, Faye Sturgill. He testified that appellant and Mr. Bell visited his aunt's house regularly at that time, and they were all friends. He met the victim through appellant and had been out with them on occasion. Mr. Richardson had visited the victim and appellant at their apartment and had spent the night there after their baby was born. Mr. Richardson testified that appellant kept clothing at the apartment and had a key. Appellant had unlocked the door on one occasion when the victim was not present.

On cross-examination, Mr. Richardson acknowledged that he did not know whether appellant had his own set of keys or shared the victim's keys with her. Mr. Richardson also testified that he saw appellant on March 30, 2009. He and Joseph Taylor gave appellant a ride that day. He said that appellant never told him that he shot Mr. Bell and the victim. Mr. Richardson stated that he told the police appellant had admitted to him that he shot the vicitm and Mr. Bell because officers threatened to charge him as an accomplice if he did not give such a statement.

Lakendrick Sturgill testified that he had known appellant since they were teenagers. A group of young men worked on cars together as a hobby. The men were together approximately every other day. Appellant, Mr. Bell, Mr. Richardson, and several other people participated. Mr. Sturgill stated that the group of men talked, shared meals, and participated in other activities together, such as going to clubs. No one seemed to have any problems with each other. Mr. Sturgill was aware that appellant had a girlfriend, and he knew her as "Dynasty." Although Mr. Sturgill was incarcerated, he knew that appellant and the victim lived together at Peppertree Apartments before he went to jail.

Appellant testified on his own behalf. He stated that on March 30, 2009, he worked at Firestone Dental Clinic and lived in apartment ten of Peppertree Apartments with the victim and their son. He met the victim when they worked together at IHOP in 2000. They moved in together in 2001. They shared several different residences thereafter.

Appellant met Mr. Bell when he started visiting the home of appellant's aunt, Ms. Sturgill, in approximately 2005. They worked on cars together and were friends. In 2009, both the victim and Mr. Bell's girlfriend worked at the same club. Appellant saw Mr. Bell

there frequently, and they talked "all the time." They would also leave the club together and visit other clubs.

Approximately three weeks prior to the victim's death, appellant arrived at the club and observed Mr. Bell and the victim sitting in the parking lot. Appellant asked what they were doing, and Mr. Bell stated that he was "serving her bars," which appellant explained meant Xanax. Appellant then left the club. He was not suspicious because both of them had told him it was "nothing." Appellant and Mr. Bell continued going out to different clubs together after that event.

Appellant testified that he and the victim moved into the apartment at Peppertree Apartments during the summer, but he could not remember the date. His name could not be on the lease because it was a Section Eight apartment, meaning that it was subsidized by the government. However, he stated that all of the furniture in the apartment belonged to him. Appellant identified a shoe box from a crime scene photograph as the box in which he kept his shoes. He could not identify the tennis shoe beside the box in the photograph because it was not his, but he believed it belonged to Mr. Bell. He indicated through photographs where he kept his clothes in the apartment.

Appellant denied that Ms. Brown paid the bills at the victim's apartment and denied that she had keys to the apartment. Appellant did not think that Ms. Brown knew he lived with the victim. The victim allegedly did not want to tell her mother that appellant lived there because her mother did not want her "messing with [him]." Ms. Brown was assisting the victim by helping her to obtain food stamps and by transporting her to various appointments, and appellant stated that the victim knew her mother would stop assisting if she knew appellant lived there. He was present in the apartment many times when Ms. Brown visited, and she was unaware that he was there.

Appellant testified that when they first moved in, they had a key card for the electronic gate, but they lost it. Because money was tight, they could not pay for a replacement, so they parked the truck by the front fence and walked through a hole in the fence to gain access to the property. When the deadbolt was installed, the victim made a key for appellant. Her mother was unaware that she gave him a key. For added security at night, they would place a knife, screwdriver, or some other sharp object over the door to prevent an intruder from bursting through the door.

Appellant explained that on the Saturday preceding the victim's death, they had an argument about money. He left and rode around with a friend that day. He spent the night at his sister's house. On Sunday, he came home in the evening to change clothes, but the victim had already left for work. He did not go to the club that night but rather went to a

different club with his sister and her friend. He returned to his sister's house to spend the night on Sunday night. On Monday morning, his mother picked him up at his sister's house and drove him to work. Once there, he checked all of the vans. He used one of the vans to go home and get some money so he could buy lunch that day and to put away his gun. When appellant arrived at the apartment complex, he parked on the street, walked through the hole in the fence, and approached the apartment. As he inserted his key into the lock, "[s]omething was holding him back from getting in." He then heard a male voice and knocked on the door. He kept trying to get in, but after continuously hearing a male voice, he kicked in the door.

When appellant went upstairs, he saw Mr. Bell and "kind of freaked out." Appellant asked, "What are you doing in my bed?" Appellant stated that Mr. Bell "smarted off" and said something such as, "You're going to have to shoot me." Appellant noticed a pile of clothing beside Mr. Bell and was not sure if Mr. Bell was reaching for something. When Mr. Bell reached out, appellant "blanked out and . . . shot him."

Appellant clarified that he could not gain entry into the apartment because of "[their] little security" measure, referring to "probably a screwdriver" that was placed over the door. He continued to explain that after he "blanked" out, the victim ran up to him screaming. They began "tussling." He was afraid that the victim would shoot him if she obtained the gun. He shot her as they were "tussling" by the stairs. He claimed that he did not intend to shoot her and that he was shooting the gun as they were both falling down the stairs. When he noticed that the victim was not moving, he fled the apartment, got into the van, and drove away. He drove to his mother's house, borrowed her car, and left her house. He later had his sister take his mother's car back to her house, and he drove away with Mr. Taylor and Mr. Richardson. He claimed that he was going to turn himself in to authorities later that night, but he was apprehended by the TACT unit before he could do so. Appellant told the jury that he loved the victim and that he "just snapped" when he saw his friend in bed with her.

On cross-examination, the State introduced evidence that appellant was convicted of assault against the victim in July 2007 and had entered a guilty plea to domestic assault against the victim in August 2007. He also had a conviction for carrying a weapon on school property. He admitted that in viewing the photographs from the crime scene, he could not see the screwdriver that he believed the victim had placed in the door frame. He stated that the threw the murder weapon out of the window of the van as he crossed railroad tracks.

After deliberating, the jury found appellant guilty of two counts of second degree murder and one count each of attempted first degree murder and especially aggravated burglary. The trial court merged the two convictions for second degree murder.

B.  Sentencing

The trial court held a sentencing hearing, at which the victim's sister, Jessica Brown, testified.  She stated that the victim's relationship with appellant was abusive, and she tried to convince the victim to end it.  Ms. Brown read a letter she had composed to the court, in which she relayed the effect her sister's death had on her and her family.

Appellant's counsel informed the court that appellant's pastor, uncle, and cousin were present in the courtroom but would not be called to testify.  He presented the testimony of appellant's aunt, Latanya Holmes.  She testified that appellant was a hard worker, a loving father, and a good person.

Burnette Odom, appellant's mother, reiterated that he was a good worker and a caring father.  She testified that she visited appellant in jail regularly, and he spoke about reading the Bible when she visited.  She stated that appellant expressed his remorse to her.

Appellant spoke to the court and apologized to the family of the victim.  He testified that he had taken anger management classes while in jail.  He begged the court for mercy in sentencing.

The trial court reviewed the pertinent factors and sentencing principles and gave great weight to the factor that appellant had a previous history of criminal convictions and criminal behavior in addition to those necessary to establish the range of punishment. *See* Tenn. Code Ann. § 40-35-114(1) (2010).  The court also found that appellant treated or allowed both victims to be treated with exceptional cruelty during the commission of the offenses and placed great weight on that factor. *See id.* § 40-35-114(5). The trial court gave great weight to the factor that appellant employed or possessed a firearm, explosive device, or other deadly weapon in committing the offenses. *See id.* § 40-35-114(9).  The court found no mitigating factors.  The trial court sentenced appellant to twenty-five years as a violent offender for second degree murder, twenty years as a standard offender for attempted first degree murder, and twelve years as a standard offender for especially aggravated burglary.

In considering sentence alignment, the court found that appellant was a dangerous offender whose behavior indicated little or no regard for human life and had no hesitation about committing a crime in which the risk to human life was high. *See* Tenn. Code Ann. § 40-35-115(b)(4) (2010). The trial court made the requisite findings that the aggregate sentence reasonably related to the severity of the offense and was necessary to protect the public from further criminal acts by appellant. *See State v. Wilkerson*, 905 S.W.2d 933, 939 (Tenn. 1995). Based on its findings, the trial court ordered all of appellant's sentences to run consecutively to each other, resulting in an effective sentence of fifty-seven years, with

thirty-two years to be served at 30% release eligibility and twenty-five years to be served at 100% release eligibility.

## II. Analysis

Appellant challenges the sufficiency of the evidence underlying his convictions for second degree murder and attempted first degree murder and the trial court's imposition of consecutive sentences.

## A. Sufficiency of the Evidence

The standard for appellate review of a claim challenging the sufficiency of the State's evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (citing *Johnson v. Louisiana*, 406 U.S. 356, 362 (1972)); *see* Tenn. R. App. P. 13(e); *State v. Davis*, 354 S.W.3d 718, 729 (Tenn. 2011). To obtain relief on a claim of insufficient evidence, appellant must demonstrate that no reasonable trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *See Jackson*, 443 U.S. at 319. This standard of review is identical whether the conviction is predicated on direct or circumstantial evidence, or a combination of both. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011); *State v. Brown*, 551 S.W.2d 329, 331 (Tenn. 1977).

On appellate review, "'we afford the prosecution the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences which may be drawn therefrom.'" *Davis*, 354 S.W.3d at 729 (quoting *State v. Majors*, 318 S.W.3d 850, 857 (Tenn. 2010)); *State v. Williams*, 657 S.W.2d 405, 410 (Tenn. 1983); *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). In a jury trial, questions involving the credibility of witnesses and the weight and value to be given the evidence, as well as all factual disputes raised by the evidence, are resolved by the jury as trier of fact. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *State v. Pruett*, 788 S.W.2d 559, 561 (Tenn. 1990). This court presumes that the jury has afforded the State all reasonable inferences from the evidence and resolved all conflicts in the testimony in favor of the State; as such, we will not substitute our own inferences drawn from the evidence for those drawn by the jury, nor will we re-weigh or re-evaluate the evidence. *Dorantes*, 331 S.W.3d at 379; *Cabbage*, 571 S.W.2d at 835; *see State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984). Because a jury conviction removes the presumption of innocence that appellant enjoyed at trial and replaces it with one of guilt at the appellate level, the burden of proof shifts from the State to the convicted appellant, who must demonstrate to this court that the evidence is insufficient to support the jury's findings. *Davis*, 354 S.W.3d at 729 (citing *State v. Sisk*, 343 S.W.3d 60, 65 (Tenn. 2011)).

Specifically, appellant contests the sufficiency of the evidence underlying his convictions for second degree murder for the death of the victim and his conviction for attempted first degree murder for the injuries inflicted upon Mr. Bell. We note that he does not contest the evidence supporting his conviction for especially aggravated burglary.

Second degree murder is defined by statute as "[a] knowing killing of another." Tenn Code Ann. § 39-13-210(a)(1) (2010). "A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result." *Id.* § 39-11-302(b). Whether the defendant "knowingly" killed the victim is a question of fact for the jury. *State v. Noura Jackson*, No. W2009-01709-CCA-R3-CD, 2012 WL 6115084, at *59 (Tenn. Crim. App. Dec. 10, 2012). "The jury may infer intent from the character of the offense and from all the facts and circumstances surrounding the offense." *Id.*

Viewed in the light most favorable to the State, the evidence received at trial established that appellant banged on the victim's apartment door for several minutes, stopped for a time then resumed knocking, at which time he kicked in the door. Appellant admitted to breaking through the victim's apartment door and shooting both the victim and Mr. Bell. Appellant shot the victim four times, killing her, and critically injured Mr. Bell by shooting him one time. The evidence is sufficient to support the jury's verdict that established appellant knew his conduct was reasonably certain to cause the victim's death.

In so concluding, we reject appellant's assertion that the proof supports a conviction for only the lesser-included offense of voluntary manslaughter. "Voluntary manslaughter is the intentional or knowing killing of another in a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner." Tenn. Code Ann. § 39-13-211(a) (2010). Appellant maintains that he was acting in the heat of passion and upon adequate provocation brought about by finding his friend and girlfriend together in the bed appellant allegedly shared with the victim. The trial court instructed the jury on the offenses of first degree murder, second degree murder, voluntary manslaughter, reckless homicide, and criminally negligent homicide. The court's instructions explained the requisite elements of each offense and the distinction between second degree murder and voluntary manslaughter. By returning a verdict of second degree murder, the jury rejected appellant's claim that he acted in a state of passion and upon adequate provocation. "The jury was not required to accredit [appellant's] statements about the factual events that preceded the crime, nor was it required to draw a conclusion that those facts established that [appellant] had been adequately provoked to act in a state of passion when he shot and killed the victim." *State v. Dyron Norm Yokley*, No. E2009-02646-CCA-R3-CD, 2011 WL 2120096, at *19 (Tenn. Crim. App. May 20, 2011), *perm. app. denied* (Tenn. Sept. 21, 2011); *see State v. Williams*, 38 S.W.3d 532, 538-39 (Tenn. 2001) (noting that whether a knowing killing is committed

in a state of passion produced by adequate provocation is a question of fact for the jury). A rational jury could conclude from the evidence presented that appellant was not adequately provoked to act in a heat of passion in bursting through the victim's apartment door and shooting her and Mr. Bell.

With regard to the attempted first degree murder of Mr. Bell, the trial court instructed the jury:

> For you to find a person guilty of criminal attempt, the State must have proven beyond a reasonable doubt the existence of the following essential elements:
>
>> One, that the defendant intended to commit the specific offense of First Degree Murder of Lonnie Bell; and two, that the defendant did some act intending to cause an essential element of First Degree Murder to occur, and at the time believed the act would cause the element to occur without further action on the defendant's part; or that the defendant did some act intending to complete a course of action or cause a result that would constitute First Degree Murder under the circumstances, as the defendant believed them to be at the time, and his actions constituted a substantial step toward the commission of First Degree Murder. The defendant's actions do not constitute a substantial step unless the defendant's entire course of action clearly shows his intent to commit First Degree Murder.

*See* Tenn. Code Ann. §§ 39-12-101, 39-13-302(a)(1) (2010). As noted above, viewing the evidence in the light most favorable to the State, appellant constantly knocked on the victim's door for a time, halted briefly, then resumed and eventually kicked in the door. Appellant's actions in returning to the victim's apartment after ceasing his attempts to gain entry demonstrate premeditation. Appellant is not entitled to relief on his claims that the evidence was insufficient to support his convictions.

### B. Sentencing Issues

Appellant argues that the individual sentences for each of his convictions were excessive and that the trial court's ordering of fully consecutive sentence alignment also rendered the effective sentence excessive.

At the time the parties briefed the issues in this case, they did not have the benefit of the most recent Tennessee Supreme Court opinion regarding review of sentencing issues. They incorrectly, through no fault of their own, cited the standard of review as "de novo with a presumption of correctness." As discussed herein, our standard of review on appeal is "abuse of discretion with a presumption of reasonableness." *State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012).

In determining an appropriate sentence, a trial court must consider the following factors: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on mitigating and enhancement factors; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; (7) any statement the defendant makes on his own behalf as to sentencing; and (8) the potential for rehabilitation. Tenn. Code Ann. §§ 40-35-103(5), -113, -114, -210(b) (2010). In addition, "[t]he sentence imposed should be the least severe measure necessary to achieve the purposes for which the sentence is imposed." Tenn. Code Ann. § 40-35-103(4) (2010).

When imposing a sentence within the appropriate range of punishment for a defendant,

> the court shall consider, but is not bound by, the following advisory sentencing guidelines:
>
> (1)    The minimum sentence within the range of punishment is the sentence that should be imposed, because the general assembly set the minimum length of sentence for each felony class to reflect the relative seriousness of each criminal offense in the felony classifications; and
>
> (2)    The sentence length within the range should be adjusted, as appropriate, by the presence or absence of mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114.

Tenn. Code Ann. § 40-35-210(c) (2010). From these principles, "the trial court is free to select any sentence within the applicable range so long as the length of the sentence is 'consistent with the purposes and principles of [the Sentencing Act].'" *State v. Carter*, 254 S.W.3d 335, 343 (Tenn. 2008) (quoting Tenn. Code Ann. § 40-35-210(d)).

Pursuant to the 2005 amendments, the Sentencing Act abandoned the statutory minimum sentence and rendered enhancement factors advisory only. *See* Tenn. Code Ann. §§ 40-35-114, 40-35-210(c) (2010). The 2005 amendments set forth certain "advisory sentencing guidelines" that are not binding on the trial court; however, the trial court must nonetheless consider them. *See id*. § 40-35-210(c). Although the application of the factors is advisory, a court shall consider "[e]vidence and information offered by the parties on the mitigating and enhancement factors in §§ 40-35-113 and 40-35-114." *Id*. § 40-35-210(b)(5). The trial court must also place on the record "what enhancement or mitigating factors were considered, if any, as well as the reasons for the sentence, to ensure fair and consistent sentencing." *Id*. § 40-35-210(e). The weighing of mitigating and enhancing factors is left to the sound discretion of the trial court. *Carter*, 254 S.W.3d at 345. The burden of proving applicable mitigating factors rests upon appellant. *State v. Mark Moore*, No. 03C01-9403-CR-00098, 1995 WL 548786, at *6 (Tenn. Crim. App. Sept. 18, 1995). The trial court's weighing of the various enhancement and mitigating factors is not grounds for reversal under the revised Sentencing Act. *Carter*, 254 S.W.3d at 345 (citing *State v. Devin Banks*, No. W2005-02213-CCA-R3-DD, 2007 WL 1966039, at *48 (Tenn. Crim. App. July 6, 2007), *aff'd as corrected*, 271 S.W.3d 90 (Tenn. 2008)).

When an accused challenges the length and manner of service of a sentence, this court reviews the trial court's sentencing determination under an abuse of discretion standard accompanied by a presumption of reasonableness. *Bise*, 380 S.W.3d at 707. If a trial court misapplies an enhancing or mitigating factor in passing sentence, said error will not remove the presumption of reasonableness from its sentencing determination. *Id.* at 707. This Court will uphold the trial court's sentencing decision "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Id.* Moreover, under such circumstances, an appellate court may not disturb the sentence even if it had preferred a different result. *See Carter*, 254 S.W.3d at 346. The party challenging the sentence imposed by the trial court has the burden of establishing that the sentence is erroneous. Tenn. Code Ann. § 40-35-401 (2010), Sentencing Comm'n Cmts.; *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991).

### 1. Excessive Sentences

Appellant first contends that the trial court erred in imposing the maximum sentence for second degree murder and especially aggravated burglary. He claims that the trial court erred in finding enhancement factor (1), that appellant had a previous history of criminal convictions or criminal behavior, in addition to those necessary to establish the appropriate range. *See* Tenn. Code Ann. § 40-35-114(1) (2010). The trial court sentenced appellant as a Range I offender. It noted appellant's three prior misdemeanor convictions, two of which involved violence to the victim and one of which involved illegally carrying a weapon on

school property. Thus, the trial court properly considered all of appellant's prior convictions in finding this enhancement factor because none of the convictions were used to establish the applicable range of punishment.

Although appellant does not challenge the trial court's finding of enhancement factor (9), we conclude that the court properly determined that appellant employed or possessed a firearm, explosive device, or other deadly weapon in committing the offenses. Tenn. Code Ann. § 40-35-114(9) (2012). We note that none of the convicted offenses require the use of a firearm or deadly weapon, and accordingly, this enhancement factor is not precluded by any of the convictions. *See* Tenn. Code Ann.§§ 39-13-210, -14-404 (2010).

We have reviewed the record and conclude that with respect to the victim, the evidence supports the trial court's finding that appellant treated or allowed the victim to be treated with exceptional cruelty during the commission of the offenses. Tenn. Code Ann. § 40-35-114(5) (2012). We do not glean support for application of this factor with regard to the offense involving Mr. Bell.

Application of enhancement factor (5) requires the trial court to make "a finding of cruelty under the statute 'over and above' what is required to sustain a conviction for an offense." *State v. Arnett*, 49 S.W.3d 250, 258 (Tenn. 2001) (quoting *State v. Embry*, 915 S.W.2d 451, 456 (Tenn. Crim. App. 1995)); *State v. Poole*, 945 S.W.2d 93, 98 (Tenn. 1997) (To support a finding of exceptional cruelty, the facts must demonstrate "a culpability distinct from and appreciably greater than that incident to" the crime.). "[S]uch evidence must 'denote[ ] the infliction of pain or suffering inflicted for its own sake or from the gratification derived therefrom, and not merely pain or suffering inflicted as the means of accomplishing the crime charged.'" *Id.* (quoting *State v. Kelly Haynes*, No. W1999-01485-CCA-R3-CD, 2000 WL 298744, at *3 (Tenn. Crim. App. Mar. 14, 2000)). Appellate courts have upheld the application of this factor based on evidence of extensive physical or psychological abuse or torture. *Id*.

In applying this factor to the convictions involving the victim, the trial court relied upon the recording of the victim's 9-1-1 call:

> What is recorded on tape, one of the more chilling tapes that I've heard in thirty years of practicing law. [Appellant] shoots [the victim] and [the victim] is begging, pleading for her life on this tape. "Boochie, what are you doing? I can't breathe. You hurt me. What are you doing? Please don't kill me, Boochie. Please. Stop. Stop. Boochie. I can't breathe. Stop." And you hear this woman being tortured. Literally, her death is being recorded. Very seldom, very seldom, in thirty years of practicing law[,] there's only two

incidences where I run [sic] into a situation where a person is killed and you hear the voice of this woman being recorded where she's begging for her life[,] and this is exceptional cruelty.

The trial court also cited the medical examiner's testimony regarding the multiple gunshot wounds the victim would have endured prior to her death. The evidence supports the trial court's application of enhancement factor (5) to the offenses involving the victim.

With regard to Mr. Bell, the trial court emphasized appellant's pounding on the door as torturing the victim and Mr. Bell. However, Mr. Bell offered no testimony that he was frightened or terrified of the impending events. The court also noted Mr. Bell's protracted injuries and recovery time. We conclude that the severity of Mr. Bell's injuries is "merely pain or suffering inflicted as the means of accomplishing the crime charged." *Arnett*, 49 S.W.3d at 258. The trial court erred in applying this enhancement factor with respect to Mr. Bell.

Appellant also asserts that the trial court failed to consider all of the sentencing guidelines in imposing sentence. However, the record from the sentencing hearing reflects that the trial court properly considered the principles of the Sentencing Act in pronouncing appellant's sentence and thus belies appellant's argument. As appellant noted in his brief, the trial court's weighing of the various enhancement and mitigating factors is not grounds for reversal under the revised Sentencing Act. *Carter*, 254 S.W.3d at 345 (citations omitted).

Although the trial court misapplied enhancement factor (5) to the conviction for attempted first degree murder of Mr. Bell, said error does not remove the presumption of reasonableness from its sentencing determination. *Bise*, 380 S.W.3d at 709. Because the sentence imposed by the trial court "is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute, " we uphold appellant's sentence. *Id.* at 709-10. Based on our review of the record, we conclude that the trial court did not abuse its discretion sentencing appellant to the maximum number of years for second degree murder and especially aggravated burglary.

### 2. Consecutive Sentences

Appellant maintains that none of the legislatively-defined categories for which consecutive sentencing is allowed applies to him and that the trial court erred in concluding that he is a dangerous offender. He bases his position on the fact that appellant "committed crimes only against [the victim]."

The determination of whether to order consecutive rather than concurrent sentences is a matter primarily within the discretion of the trial court. *See State v. Hastings*, 25 S.W.3d 178, 181 (Tenn. Crim. App. 1999). The procedure is governed by Tennessee Code Annotated section 40-35-115, which lists seven factors that are relevant to a trial court's sentencing decision. The court may order consecutive sentences if it finds by a preponderance of the evidence that one or more of the seven statutory criteria exists. Tenn. Code Ann.§ 40-35-115(b) (2010). Of the seven factors, the trial court found the following applicable to appellant's case:

(4)     The defendant is a dangerous offender whose behavior indicates little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high.

The court, in addition to finding that a defendant is a "dangerous offender whose behavior indicates little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high," must also make a finding that consecutive sentencing is "necessary to protect the public against further criminal conduct by the defendant and that the consecutive sentences must reasonably relate to the severity of the offenses committed." *See State v. Wilkerson*, 905 S.W.2d 933, 939 (Tenn. 1995).

We first note that appellant omitted the fact that he committed crimes against two people, the victim and Mr. Bell. Furthermore, our review of the record also reveals that the trial court clearly and thoroughly made the requisite findings under *Wilkerson*. The trial court noted that appellant's crimes had previously been directed toward the victim until this incident in which he also almost killed Mr. Bell, thus supporting the finding that consecutive sentencing is necessary to protect the public against further criminal activity. *Id.* The court also relied upon the "extremely aggravating facts of this case" in finding that consecutive sentences reasonably relate to the severity of the crimes appellant committed. *Id.* Following our review of the record, we conclude that the record supports the trial court's finding that appellant is a dangerous offender, and the trial court did not abuse its discretion in so holding.

## CONCLUSION

Following our thorough review of the record, the parties' briefs, and applicable law, we discern no reversible error and affirm the judgments of the trial court. However, we remand the case to the trial court for correction of the judgment form for count four of the

indictment, especially aggravated burglary, to reflect the trial court's order that the sentence should run consecutively to the other counts of the indictment.

_____
ROGER A. PAGE, JUDGE